IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL AYALA, | No. CIV S-04-0903-JAM-CMK-P |
|     Plaintiff, | |
|   vs. | FINDINGS AND RECOMMENDATIONS |
| ANDREASEN, et al., | |
|     Defendants. | |
| _____/ | |

        Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for summary judgment (Doc. 106). Plaintiff has not filed an opposition.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# I. BACKGROUND

## A. Plaintiff's Allegations

This action proceeds on plaintiff's fourth amended complaint, filed on June 6, 2006, as against defendants Andreasen, Bick, Enriquez, Grannis, Sullwold, Gutierrez, and Sawker.[1] Plaintiff claims that, in July 1999, he underwent surgery to place a shunt in his chest. Plaintiff asserts that a piece of this shunt broke off and lodged in or near plaintiff's heart. He states that a medical doctor attempted unsuccessfully to remove the broken piece from plaintiff's body. Plaintiff was then placed under the care of a specialist from the University of California, San Francisco. Plaintiff claims that this specialist prescribed a specific course of treatment and that defendants have interfered with this treatment for budgetary reasons.

In particular, plaintiff asserts that defendant Andreasen informed him that he would not be following the specialist's prescribed course of treatment, which included additional surgery to remove the broken shunt. Plaintiff states that, after presenting an inmate grievance concerning the issue, defendant Bick also refused to follow the specialist's recommendations. Plaintiff alleges that the remaining defendants also "acquiesced" in the above-described interference with the specialist's course of treatment.

## B. Defendants' Evidence

In support of their motion for summary judgment, defendants submit their own declarations as well as plaintiff's responses to their interrogatories. Through these documents, defendants respond to plaintiff's specific factual claims against each of them.

///
///

---

[1] The fourth amended complaint also named defendant Klingman, who has been dismissed. Defendants Gutierrez, Sawker, and Sullwold have not been served. On December 19, 2007, the court issued findings and recommendations that the unserved defendants be dismissed pursuant to Federal Rule of Civil Procedure 4(m). The undersigned renews that recommendation.

1.  <u>Andreasen</u>

In his responses to defendant Andreasen's interrogatories, plaintiff responds as follows when asked to identify the constitutional rights this defendant violated:

> Defendant violated Plaintiff's Eighth & Fourteenth Amendment rights.  Plaintiff had a right to have access to medical care and to be free from cruel and unusual punishment which Defendant violated when he intentionally interferred [sic] with, delayed, and denied Plaintiff medical attention to his serious medical needs.  Defendant violated Plaintiff's right to Due Process and Equal Protection under the law when defendant refused to address Plaintiff's many requests and appeals for medical care.

As to the specifics of this case, plaintiff stated in his responses that, from July through November 1999, defendant Andreasen was aware that plaintiff received a catheter that was ineffective but could not be removed.  Plaintiff states that, despite an October 1999 report by Dr. P. Leoni recommending immediate surgical intervention, "Defendant Dr. Andreasen took no action."  He also states that, between November 1999 and March 2001, defendant Andreasen ignored several requests for medical assessment and treatment of his chest pain.  Plaintiff states that, between March 2001 and November 2001 additional x-rays were taken and forwarded to defendant Andreasen, but that "he did not institute a medical authorization review or health care review committee to authorize surgical intervention for plaintiff's life-threatening condition."  Plaintiff states that defendant Andreasen also ignored a January 2002 recommendation by Dr. Timothy S. Hall for "surgical intervention."

In his declaration, defendant Andreasen states that, at the time relevant to plaintiff's complaint, he was the Chief Medical Officer of Building 1 at the California Medical Facility ("CMF"), but was not plaintiff's primary care physician.  He states that his involvement with plaintiff's case included review of inmate grievances or requests for accommodations pursuant to the Americans with Disabilities Act ("ADA").  Defendant Andreasen states that he was also responsible for consultations with plaintiff's primary care physicians and referrals to

/ / /

/ / /

outside specialists as needed. As to plaintiff's medical problems, defendant Andreasen states:

> I am familiar with plaintiff Manuel Ayala as Mr. Ayala was an inmate at CMF for several years. Mr. Ayala was a dialysis patient while at CMF, and received treatment from doctors and other health care professionals (nurses, medical technicians, etc.) who specifically worked with dialysis patients. he was also on the kidney transplant list at UCSF while he was incarcerated at CMF. Mr. Ayala was assigned to Housing Unit 1 . . . while at CMF. He was not diagnosed with HIV while at CMF.
>
> * * *
>
> My Ayala informed me when I first met him that a catheter tip was lodged in his heart and I confirmed that a fragment of something consistent with a catheter tip was lodges in his right ventricle. I agreed to refer Mr. Ayala to a cardiac surgeon and referred him to Dr. Klingman. I later learned that Dr. Klingman was the surgeon who previously operated on Mr. Ayala (when the catheter tip broke off and lodged in his right ventricle) and, after Mr. Ayala requested a different surgeon, I referred Mr. Ayala to Dr. Timothy Hall at the University of California, San Francisco (UCSF) Medical Center.
>
> I authorized several "temporary transfers" of Mr. Ayala for treatment with several UCSF doctors, including Dr. Hall, Dr. Sobol, and Dr. Anastossou. UCSF doctors attempted to remove the catheter fragment on October 4, 2002, through a percutaneous transvenous approach but were unsuccessful. Doctors at UCSF recommended that plaintiff undergo an open heart surgery when the transvenous approach did not work. Because the open heart procedure requires cardiopulmonary bypass and includes a 15% mortality rate, I encouraged Mr. Ayala to talk with his family before agreeing to this procedure.
>
> * * *
>
> My Ayala initially declined to undergo open heart surgery after our meeting. We discussed this issue further between 2002 and 2005 and, after declining to undergo the surgery one more time, Mr. Ayala finally decided to undergo surgery to remove the catheter fragment.
>
> Mr. Ayala ultimately underwent open heart surgery on September 12, 2005, at UCSF. The surgery was deemed a success as the catheter fragment was extracted.

Defendant Andreasen states that, due to the poor prognosis for plaintiff's kidneys, obtaining a transplant was the first priority. He adds that, for this reason, he did not believe open heart surgery to remove the catheter fragment was "absolutely necessary for Mr. Ayala when he was examined at UCSF between September 2002 through February 2003." However, he states that he did not attempt to discourage plaintiff from undergoing the surgery.

2.  <u>Bick</u>

As to defendant Bick, plaintiff's statements concerning the factual bases for liability are essentially the same as those relating to defendant Andreasen. Plaintiff adds:

> . . . For six (6) years Defendant Dr. Bick and other Defendants continued on a wholly ineffectual and repetitive course of action whereby Plaintiff would be examined by specialists who would recommend surgery only to have Defendant Dr. Bick and other Defendants re-refer Plaintiff to other cardiothoracic surgeons who would in turn make the same recommendations. This continued until September 12, 2005, when Plaintiff underwent major invasive catheter removal surgery that included a sternotomy, heart/lung bypass assist, clavicle resection, and reconstruction of Plaintiff's subclavian, innonimate, and jugular veins – a surgery that may not have been necessary if it had not been so needlessly long-delayed.

Plaintiff also states that defendant Bick failed to respond to a "missive" he sent on November 2, 2001 "which Plaintiff had sent to apprise him of his extreme chest pain and request his assistance in directing medical officials to assess and treat it."

Defendant Bick was the Chief Medical Officer for Building 4 at CMF. At the times relevant to this case, Building 4 housed inmates with HIV. Because plaintiff did not have HIV infection, he was not housed in Building 4 and, therefore, was not under defendant Bick's direct care. Defendant Bick states in his declaration that he became aware of plaintiff cardiac surgery in 1999 incident to his review of plaintiff's request for accommodation under the ADA. Defendant Bick was not plaintiff's primary care physician and, for this reason, had defendant Bick received any correspondence from plaintiff regarding his health care, he would have forwarded it to plaintiff's primary doctor. Defendant Bick states that he was never directly involved with plaintiff's medical care and that he "had no role in reviewing, approving, or delaying any requests for patients to be seen by a specialist outside CMF." Defendant Bick states that his only role regarding plaintiff case "consisted of me approving Mr. Ayala's grievance when the specialist consultation that he sought was approved by another physician."

/ / /

/ / /

3.  Enriquez

Plaintiff responded to defendant Enriquez' interrogatories by stating that defendant Enriquez was aware of his medical problems by virtue of his prison grievances and request for ADA accommodation. Plaintiff states that "Defendant Pio Enriquez failed to properly investigate the seriousness of Plaintiff's medical needs before making a decision and denying my grievance (CDCR 602)." He also states that defendant Enriquez failed to follow the recommendations of the examining doctors who indicated the need for removal of the catheter fragment. Plaintiff claims that defendant Enriquez "allowed Plaintiff to suffer a total of five years."

As with defendants Andreasen and Bick, defendant Enriquez offers his declaration in support of summary judgment. In his declaration, defendant Enriquez states that he was responsible for reviewing plaintiff's Director's level inmate grievance. He states that his role does not include determining whether a physician's recommendation is correct or whether an inmate's belief as to the proper form of care is correct. Rather, his job is "simply to make sure that physicians and prison officials reviewed an inmate's grievance and responded to all of the inmate's inquiries." He states that he is "neither authorized nor qualified to second-guess the physician." According to defendant Enriquez, by the time he reviewed plaintiff's grievance, plaintiff had already been examined by Dr. Hill at UCSF who recommended a series of tests and evaluations prior to any operation in order to establish a baseline. For this reason, defendant Enriquez denied plaintiff's grievance. Other than this involvement, defendant Enriquez had no knowledge with or involvement in plaintiff's medical care.

4.  Grannis

In his responses to defendant Grannis' interrogatories, plaintiff states that his claim against defendant Grannis is based on her role as Chief of the Inmate Appeals Branch ("IAB"). Specifically, he states that defendant Grannis violated plaintiff's constitutional rights because she is responsible "as Chief, Inmate Appeal, to oversee the decision or action taken by

Defendant . . . Enriquez, Appeals Examiner, Facility Captain when he intentionally denied the Director's Level appeal casing [sic] denial of medical attention to Plaintiff's serious medical needs."

In her declaration, defendant Grannis states that, as Chief of the IAB, she is responsible for reviewing inmate grievances. She adds, however, that she was not the chief at the time plaintiff's grievances were filed in this case. She states that she ". . . was not aware of Mr. Ayala's Director's Level Appeal when it was filed . . ." and that she ". . . literally had nothing to do with any decision made in the IAB pertaining to Mr. Ayala's Director's level appeal . . . ." She also states that she never supervised defendant Enriquez with respect to any of plaintiff's grievances.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of

1  proof concerning an essential element of the nonmoving party's case necessarily renders all other
2  facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as
3  whatever is before the district court demonstrates that the standard for entry of summary
4  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

5  If the moving party meets its initial responsibility, the burden then shifts to the
6  opposing party to establish that a genuine issue as to any material fact actually does exist. See
7  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to
8  establish the existence of this factual dispute, the opposing party may not rely upon the
9  allegations or denials of its pleadings but is required to tender evidence of specific facts in the
10 form of affidavits, and/or admissible discovery material, in support of its contention that the
11 dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party
12 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
13 of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);
14 T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and
15 that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict
16 for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

17 In the endeavor to establish the existence of a factual dispute, the opposing party
18 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
19 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
20 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
21 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
22 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory
23 committee's note on 1963 amendments).
24 / / /
25 / / /
26 / / /

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III.  DISCUSSION

The only claim in this case is an Eighth Amendment claim based on delay in receiving medical treatment relating to the catheter fragment. The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of

the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

///

       Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

       To the extent liability is asserted on the basis of defendants holding supervisory positions, it is well-settled that supervisory personnel are generally not liable under § 1983 for the actions of their employees. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding that there is no respondeat superior liability under § 1983). A supervisor is only liable for the constitutional violations of subordinates if the supervisor participated in or directed the violations, or had actual knowledge of the violations and failed to act to prevent them. See id. When a defendant holds a supervisory position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the involvement of supervisory personnel in civil rights violations are not sufficient. See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

       Defendants argue that each defendant is entitled to summary judgment.

       **A.**    **Andreasen**

       Defendant Andreasen, as the Chief Medical Officer of Building 1 where plaintiff was incarcerated while at CMF, was directly responsible for overseeing plaintiff's medical care. In this capacity, defendant Andreasen "reviewed inmate grievances (known as 602's) authored by plaintiff, consulted with plaintiff's primary care physicians and/or Nephrologist, and approved referrals to specialists for care that could not be provided to Mr. Ayala at CMF." Defendants

///

///

///

outline the following facts relating to defendant Andreasen's involvement in plaintiff's case:[2]

> After learning that plaintiff had a catheter fragment lodged in his right atrium from a prior surgery, Dr. Andreasen agreed to refer him to outside medical providers for consultations on numerous occasions. Dr. Andreasen authorized several "temporary transfers" of plaintiff for treatment with several UCSF doctors, including Dr. Hall, Dr. Sobol, and Dr. Anastossou. UCSF doctors attempted to remove the catheter fragment from plaintiff's right atrium on October 2, 2002 through a percutaneous transvenous approach but were unsuccessful. Because the open heart procedure requires cardiopulmonary bypass and includes a 15% mortality rate, Dr. Andreasen encouraged plaintiff to talk with his family before agreeing to this procedure.
> In 2002, the catheter fragment had not appreciably changed position and was not causing significant pain to plaintiff. Dr. Andreasen therefore did not believe that surgery was absolutely necessary for plaintiff when he was first examined at UCSF. Dr. Andreasen did not intend to discourage plaintiff from undergoing a medically necessary procedure. plaintiff initially declined to undergo open heart surgery after meeting with Dr. Andreasen. After declining to undergo the surgery on one other occasion, plaintiff finally decided to undergo surgery to remove the catheter fragment in 2005. Plaintiff ultimately underwent open heart surgery on September 12, 2005 at UCSF. The surgery was deemed a success as the catheter fragment was extracted and plaintiff's recovery initially occurred without incident. The surgery that plaintiff underwent on September 12, 2005 was not any different nor any more difficult than what he could have underwent in 2002-2003 and delaying the surgery did not cause plaintiff any additional injury.

As indicated above, plaintiff did not file an opposition to defendants' motion for summary judgment. Thus, the facts established by the evidence provided by defendants are undisputed. Based on these undisputed facts, the court agrees that defendant Andreasen cannot be found liable for an Eighth Amendment violation. It is clear that defendant Andreasen provided plaintiff treatment in response to the catheter fragment. Specifically, he referred plaintiff to a cardiac specialist, Dr. Hall, at UCSF. He also authorized several "temporary transfers" to enable plaintiff to travel to UCSF for treatment with various other specialists, including Drs. Sobol and Anastossou. Incident to this treatment, UCSF doctors tried to remove the catheter fragment in October 2002. When this was unsuccessful and the UCSF doctors

---

[2] Citations to defendants' statement of undisputed material fact are omitted from excerpts from defendants' motion.

recommended open heart surgery, defendant Andreasen spoke with plaintiff about the recommendation for surgery, explained the risks, and encouraged plaintiff to speak with his family. According to defendant Andreasen, plaintiff initially refused the surgery and that he and plaintiff continued to discuss the issue until 2005 when plaintiff ultimately decided to undergo surgery.

Not only did defendant Andreasen provide treatment and care each step of the way by authorizing plaintiff to see necessary outside specialists, any delay in obtaining the surgery was the result of the time it took plaintiff to decide to undergo the procedure. There is simply no evidence before the court to support plaintiff's contention that defendant Andreasen "took no action." Based on this record, the court finds that defendant Andreasen is entitled to summary judgment.

### B. **Bick**

Defendants outline the following facts relevant to defendant Bick:

> Dr. Bick was the Chief Medical Officer of Unit 4 of the California Medical Facility (CMF) state prison in Vacaville, California. during the years relevant to plaintiff's complaint (1999-2005). Unit 4 of the CMF houses inmates who are infected with HIV. Inmates who do not suffer from HIV are assigned to Unit 1. As CMO of Unit 4, Dr. Bick was not a treating physician or supervisor of treating physicians for inmates in other units at CMF. Mr. Ayala does not have HIV and was not an inmate housed in Unit 4 at CMF.
> Dr. Bick was not a primary care physician assigned to care for plaintiff nor is he a Nephrologist. If plaintiff requested medical care at CMF, doctors from Unit 1 would have responded to his requests. Doctors from Unit 4 would not have been responsible for plaintiff's care.
> Dr. Bick's only involvement with plaintiff's medical care occurred on May 27, 2002, when he authored a First level Reasonable Modification or Accommodation Request to Mr. Ayala's inmate grievance or 602, (attached as exhibit B.7 to plaintiff's fourth amended complaint, court doc. 23). Becaue the relief plaintiff sought in this inmate grievance had been scheduled before Dr. Bick authored his response, Dr. Bick partially granted this appeal. Any letter sent by plaintiff to Dr. Bick would have been referred to plaintiff's primary physician because Dr. Bick was not responsible for or involved in care for patients in plaintiff's housing unit at CMF. Dr. Bick did not ignore any requests for care that he received from Mr. Ayala nor did he delay or interfere with any requests for care by Mr. Ayala.

Defendants argue that plaintiff cannot establish that defendant Bick both knew of and disregarded any serious medical need. They also argue that, to the extent plaintiff disagrees with any decision defendant Bick made, such a claim is not cognizable under § 1983.

Again, given plaintiff's failure to file an opposition to defendants' motion, the facts are undisputed. As defendants note, the undisputed facts show that defendant Bick's only involvement with plaintiff's medical problems was to review plaintiff's grievance in May 2002. As to this grievance, defendant Bick partially granted plaintiff's request to the extent plaintiff had already been scheduled to see specialists regarding the catheter fragment. It is clear that defendant Bick did not ignore plaintiff's medical condition. To the contrary, he reviewed plaintiff's grievance and agreed with plaintiff that he needed to see a specialist. Further, as defendants note, to the extent plaintiff's claim against defendant Bick is based on various decisions to "re-refer" him to specialists for additional evaluation, at best such a claim constitutes a difference of opinion and is not cognizable under § 1983. For these reasons, defendant Bick is entitled to summary judgment.

### C.  Enriquez

Defendant Enriquez, who worked in the IAB at the time relevant to this action, was responsible for reviewing plaintiff's Director's level inmate grievance as well as his request for ADA accommodations. As to defendant Enriquez, defendants outline the following facts in their motion for summary judgment:

> The inmate grievance that Mr. Ayala refers to regarding his allegations against defendants Grannis and Enriquez is director's level no. 0201688. In this grievance, plaintiff requested a referral to a specialist to have the catheter fragment removed. (Court doc. 23, Plaintiff's complaint, exhibit B. 11). The director's level decision on plaintiff's inmate appeal was denied by Enriquez on September 30, 2002. Enriquez denied plaintiff's directors' level appeal because the relief plaintiff sought (a consultation with a doctor at UCSF) had already occurred by the time Enriquez was presented with and responded to the appeal in question. Plaintiff was examined on September 5, 2002 by Dr. Timothy Hall of UCSF. Dr. Sobol of UCSF attempted to remove the catheter fragment from Mr. Ayala's right atrium on October 2, 2002 through a percutaneous transvenous approach but was unsuccessful. Enriquez did not deny

14

1       plaintiff access to medical care or delay his access to medical care, intentionally or negligently.

3 Defendants argue:

> Defendant Enriquez did deny plaintiff's director's level appeal. Contrary to plaintiff's allegations, however, Enriquez did not intend to delay medical care to plaintiff when he denied the appeal; the appeal was denied simply because by the time Enriquez responded to the appeal, plaintiff had obtained the relief he sought.
>     Exhibits B.6 and B.8 to plaintiff's complaint describe the relief plaintiff requested when he filed both the reasonable accommodation request and his inmate appeal. Plaintiff requests to "go back to U.C.S.F. and get the object removed" and to be "taken outside to U.C.S.F. to have the object removed immediately" in each respective request. Since plaintiff was admittedly examined by Dr. Hall on September 6, 2002, the September 30, 2002 Director's Level Appeal Decision correctly asserted that plaintiff obtained the relief he initially sought. Since plaintiff returned to UCSF Medical Center on October 4, 2002, when Dr. Sobol attempted to remove the catheter fragment through a percutaneous transvenous approach, plaintiff obtained the relief sought in his inmate grievance appeal.
>    . . . Since plaintiff had already obtained a medical appointment from the specialist that he requested when Enriquez rendered his decision, Enriquez could not have known that denying the appeal would create an excessive risk of harm to plaintiff. Enriquez's decision, combined with the records from plaintiff's medical providers, prove that plaintiff was receiving adequate medical care as of September 30, 2002. Without some evidence that plaintiff's requests for consultations were actually being denied or delayed, defendants submit that Mr. Ayala's claims against Enriquez fail to establish a cause of action under 42 U.S.C. section 1983.
>     Even if defendant Enriquez's decision could be considered a denial or delay of medical care, his decision did not cause any injury to plaintiff because doctors attempted to remove the catheter fragments four (4) days after his decision. Plaintiff's theory that Pio Enriquez delayed or denied medical care to plaintiff is wrong because the denial of plaintiff's appeal did not delay any surgery that plaintiff sought (Regardless of whether the October 4, 2002 procedure was successful, plaintiff did undergo surgery as he requested), Enriquez caused no injury to plaintiff. Summary judgment is therefore appropriate in favor of defendant Enriquez.

Plaintiff offers no rebuttal to this argument, which the court finds persuasive. The undisputed facts establish that defendant Enriquez reviewed plaintiff's inmate grievance and request for ADA accommodation regarding the catheter fragment in order to ensure that plaintiff's medical condition was being adequately treated. By the time defendant Enriquez

reviewed the grievance and ADA request, plaintiff had been seen by doctors at UCSF.  Thus, based on the information available to defendant Enriquez at the time, plaintiff's medical needs were being met.  In addition, the facts reflect that doctors attempted removal of the catheter only a short time after defendant Enriquez' review of plaintiff's case.  For these reasons, he cannot be liable for any delay in treatment.

      **D.**    **Grannis**

As to defendant Grannis, defendants outline the following undisputed facts:

> While N. Grannis is currently the Chief of IAB, Grannis did not become Chief until October 10, 2002.  Grannis was not responsible for reviewing Director's Level Appeals before she became Chief of IAB.  N. Grannis did not review plaintiff Manuel Ayala's Director's Level Appeal, IAB case no. 0201688, the only inmate grievance that plaintiff refers to in his allegations concerning N. Grannis.  Grannis did not consult with P. Enriquez prior to or when P. Enriquez denied plaintiff's Director's Level Appeal, IAB case no. 0201688.  N. Grannis literally had no involvement with Mr. Ayala's inmate appeal and only became aware of the grievance when she was served with the complaint in this case.
> Pio Enriquez is a Facility Captain who works at the IAB and he responded to plaintiff's Directors Level Appeal, IAB case no. 0201688.  Mr. Enriquez is authorized to respond to inmate directors' level appeals on behalf of the IAB and did not need to consult with Grannis prior to drafting the response to IAB case no. 0201688.

As to plaintiff's claim of liability, defendant argue:

> Plaintiff's allegation that, if N. Grannis had screened his director's level appeal of his inmate grievance, the outcome would have been more favorable, is entirely speculative.  N. Grannis' and Pio Enriquez's declarations establishes that Grannis was not required to screen every director's level appeal.  Since N. Grannis did not participate in any action that deprived plaintiff of his constitutional rights, plaintiff must allege that she is liable in her role as a supervisor.

Regarding supervisory liability, defendants assert:

> Plaintiff does not satisfy any of the necessary criteria to hold defendant Grannis liable in her role as a supervisor.  The Grannis declaration and the Enriquez declaration clarify that Enriquez acted individually when he denied plaintiff's appeal and that Grannis was not required to approve of Mr. Enriquez's decision.  Plaintiff's complaint and discovery responses establish that Grannis is not alleged to have directed Mr. Enriquez to perform any activity.  Lastly, plaintiff does not allege that Grannis failed to train. Enriquez properly.

1  Defendants conclude that "Grannis cannot be held liable under 42 U.S.C. section 1983 because
2  she did not screen plaintiff's directors' level appeal and no evidence supports a theory of
3  supervisor liability."
4          The court agrees with defendants that defendant Grannis is entitled to summary
5  judgment. Plaintiff's responses to her interrogatories make clear that his claim is based on
6  plaintiff's assertion that, as Chief of the IAB, defendant Grannis was responsible for overseeing
7  review of his inmate grievance. However, as established by defendant Grannis' undisputed
8  declaration, she was not Chief of the IAB at the time plaintiff's grievance was processed.
9  Defendant Enriquez was involved with plaintiff's grievance at the Director's level of review –
10 not defendant Grannis. Therefore, because defendant Grannis had no personal involvement or
11 responsibility with respect to plaintiff's medical situation, she cannot be liable.
12 / / /
13 / / /
14 / / /
15 / / /
16 / / /
17 / / /
18 / / /
19 / / /
20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /

## IV. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Defendants' unopposed motion for summary judgment (Doc. 106) be granted;

2. Defendants Gutierrez, Sawker, and Sullwold be dismissed pursuant to Federal Rule of Civil Procedure 4(m) for lack of service; and

3. The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 26, 2008

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE